IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Genuine Truth Banner, | ) | Case No.: 6:21-cv-03456-JD-KFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION & ORDER** |
| Mr. Tisdale, Branden Davis, Lt. Burley, | ) | |
| Mrs. Tucker, Officer McKissack, and Sgt. | ) | |
| Vernon Adams, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation of United States Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report") (DE 197), made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(d) of the District of South Carolina.[1] Plaintiff Genuine Truth Banner ("Banner" or "Plaintiff"), proceeding *pro se*, filed this Complaint seeking relief pursuant to 42 U.S.C. § 1983 for alleged excessive use of force on April 2, 2020, while he was housed at Lee Correctional Institution ("Lee") in the custody of the South Carolina Department of Corrections ("SCDC"). (DE 1.) In addition, Plaintiff has alleged an assault and negligence State law claims.

On October 12, 2022, Defendants Mr. Tisdale ("Tisdale"), Branden Davis ("Davis"), Lt. Burley ("Burley"), Mrs. Tucker ("Tucker"), Officer McKissack ("McKissack"), and Sgt. Vernon Adams ("Adams") (collectively "Defendants"), filed their Motion for Summary Judgment (DE

---

[1]   The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1

167). This Court issued an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), which advised Plaintiff of the motion for summary judgment procedure and the possible consequences if he failed to respond adequately to Defendants' motion. (DE 169.) Plaintiff filed his Response in opposition to the Motion for Summary Judgment on November 14, 2022. (DE 183.)

On April 13, 2023, the Magistrate Judge issued the Report (DE 197), recommending Defendants' Motion for Summary Judgement (DE 167) be granted based upon Plaintiff's failure to properly exhaust his administrative remedies and that this Court should decline to exercise supplemental jurisdiction over Plaintiff's State law claims, among other matters.[2] For the reasons stated below, the Court adopts the Report as to its recommendations regarding Plaintiff's failure to exhaust administrative remedies and supplemental jurisdiction.

**BACKGROUND**

The Report sets forth the relevant facts and legal standards, which this Court incorporates herein without a full recitation. However, as a brief background relating to the objections raised by Banner, the Court provides this summary.

Banner testified that, after an assault on SCDC employee Lt. Bethea on April 2, 2020, he and several other inmates were suspected of being the persons who stabbed Lt. Bethea.[3] (DE 167-2, p. 11.) Banner testified that Defendant Associate Warden Tisdale questioned him outside the door of the F1 B side dorm, and then Tisdale directed officers "take [the plaintiff] to lock up, put

---

[2] The Report alternatively recommends disposition on the merits regarding several claims and defenses by the parties. However, the Court declines to reach these matters given the Court's decision herein.

[3] Plaintiff was charged with attempted murder following the attack on Lt. Bethea, and a jury found him not guilty in October 2021. (DE 167-2, pp 7-8.)

him in a strip cell and deal with him." (Id. at 11-1.) Banner also alleges that McKissick and another officer he did not know stood him up and walked him in a "peaceful . . . sort of transition" toward the administrative building. (Id. at 15-16.) Banner further testified that, prior to being taken from the F1 dorm to the Restrictive Housing Unit ("RHU"), all of his clothes were removed except his boxers and socks. (DE 167-2, pp. 22-23.) After he was placed in an individual RHU cell, he testified that officers patted him down and took his socks. (Id. at 27.) Banner claims that at that point McKissick was outside the door of the cell, and Davis told him, "Hey, I need your boxers" and that Davis told him there was blood on the boxers. (Id.) Banner claims he and Davis proceeded to argue back and forth and that he refused to give Davis his boxers. (Id. at 28.) Banner testified, "I took my boxers off, and I'll admit, to really just kind of spite him, instead of just giving them to him, I flushed them down the toilet." (Id. at 29.) Banner claims that Davis then "opened the food flap to the door, he grabbed his mace, he reached in and he put his hand through the food flap and maced me." (Id.)

Banner further testified that Davis left and came back with a riot shield and riot helmet along with Settles and Defendant Burley and another unknown officer, while McKissick was still outside the door. (Id. at 39-40.) Banner claims Davis jumped on his back, grabbed his left arm and twisted it, and slammed his head into the ground. (Id. at 42.) He further testified that Settles kicked him in the head, and Davis stomped on his knee. (Id. at 43-44.) Banner alleges that Tucker was "in the cell recording the whole incident and at this point, McKissick is still in the door watching." (Id. at 45.)

Banner claims that after the altercation, the officers stood him up, put a jumpsuit and handcuffs on him and took him to medical. (DE 167-2, p. 47.) However, Banner testified that he would not let the nurse evaluate him as he was "pretty hysterical" and "obviously agitated and

3

upset." (Id. at 48.) Banner also indicated that he did not feel like he was in his "right state of mind" after being assaulted, but he did not think there were any physical injuries that the nurse would have noticed other than the mace that was on him. (Id. at 49.)

Defendants submitted an affidavit from Davis who testified that Banner was not stripped down to boxers and socks prior to being escorted to RHU. (DE 168-1, ¶ 6.) Rather, Davis testified that Banner was still wearing his orange uniform as he was escorted to RHU. (Id.) Davis further testified that he observed blood on Banner's orange uniform shirt (rather than on his boxers) and directed Banner to hand over the bloody shirt as it was "evidence of a serious crime and needed to be preserved." (Id. at ¶ 7.) Davis testified that he gave Banner at least three directives, and Banner refused to comply and began flushing the shirt down the toilet. (Id.) Davis attempted to prevent Banner from doing this by using one burst of chemical munitions (23 grams) while repeating the directives. (Id.) Davis testified that he did not assault Banner in any way and at no time observed any officers assaulting him or using any excessive force against him while he was in RHU. (Id.)

Banner further testified in his deposition that at around the same time as he saw the nurse in medical, he was interviewed by Agent Thomas E. Horne, Jr., of Police Services ("Agent Horne" or "Horne").[4] (DE 167-2, pp. 50-51.) According to Banner, Agent Horne attempted to question him about the attack on Lt. Bethea, but he "was raving and ranting about the assault."[5] (Id. at 51-52). Banner testified that Agent Horne "kept trying to question" him about the assault on Lt. Bethea, but he "didn't really have much to say about that incident." (Id.) Instead, he testified that he wanted to talk to Agent Horne about the assault by the officers on him, and he told Agent Horne,

---

[4] Agent Horne served as an agent for Police Services for the SCDC from 2017 to February 2022. (DE 168-11, ¶ 2.)

[5] Although Banner claims one of the officers recorded the assault, Defendants state that no video exists regarding the use of force by the officers against Banner. (DE 48, p. 3.)

4

"You know, I don't even have to say anything. Go look at the cameras. . . . There's camera footage." (Id. at 52-54.) Banner claims that Agent Horne wrote a report while he was talking to him, he signed an acknowledgment of his Miranda rights, and that this was the only document he signed. (Id. at 83-84.)

Agent Horne testified that, on April 2, 2020, he investigated a report of an officer assault with serious injuries at Lee. (DE 168-11, ¶ 4.) Agent Horne testified that he attempted to interview Banner regarding the assault on Lt. Bethea, and that Banner was advised of and acknowledged his Miranda rights, initialing and signing the document. (Id. ¶ 8, DE 168-12, p. 26). Agent Horne prepared a report of interview detailing his interaction with Banner. (Id.; DE 168-12, p. 27). Agent Horne testified that Banner only spoke about a previous incident involving Lt. Bethea from March 2020 and would not talk about the assault of Lt. Bethea, repeatedly stating that it was all on camera. (Id. at ¶ 9.) Agent Horne testified that at no time did Banner inform him that he had been assaulted by officers, and if he had done so, he would have documented Banner's statement. (Id. at ¶¶ 9, 14). Agent Horne further attested that if he had observed any visible injuries to Banner, he would have documented them. (Id. at ¶ 12.)

Banner was transferred later the same day from Lee to Kirkland. (DE 168-7, ¶ 3.) According to the affidavits of Lt. Aaron Lockhart and Sgt. Melvin Camacho, who serve at the Central Bus Terminal for the SCDC and were dispatched to transport Banner, the transport vehicle for Banner left Lee at approximately 1:30 p.m. on April 2, 2020. (Id. at ¶¶ 2-4; DE 168-8, ¶¶ 3-4.) Lt. Lockhart and Sgt. Camacho testified that they do not recall seeing any injuries on Banner, and Banner did not mention any injuries during the transport to Kirkland. (DE 168-7, ¶¶ 5-6; DE 168-8, ¶ 5.)

Upon Banner's arrival at Kirkland, he was supposed to be assessed by medical staff. (DE 167-2, pp. 49-50, 63-64.) However, Banner testified that he refused to let the nurse at Kirkland evaluate him and refused any medical care. (Id. at 64.) Banner's SCDC medical records indicate that upon his arrival at Kirkland, Jacquetta Riley, LPN, noted that she observed Banner walking with chains and in no acute distress, his vital signs were recorded as all in the normal range, and Banner reported that he did not need medical attention at that time. (DE 168-9, M.D. ¶ 10; DE 168-10, p. 58.) The first time Banner made a written request for medical attention for the injuries he alleges he received as a result of the alleged assault by Defendants was over a year later on April 20, 2021, when he sent in a request to staff member ("RTSM"). (DE 167-2, pp. 65-67.) Thereafter, as a result of his RTSM, several outside medical examinations were scheduled, including examinations in May and June 2021, for his complaints of ringing in his ears. Banner testified that he was diagnosed with tinnitus and sensorineural hearing loss. (Id. at 70-73.)

## DISCUSSION

Banner has filed an objection to the Report (DE 205); however, to be actionable, objections to the Reports must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute*.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). "A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object." Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003). In the absence of specific

objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, the Court has identified the following specific objections, which will be addressed herein, regarding the Report's finding that Banner failed to exhaust his administrative remedies. Ostensibly, Banner alleges a genuine issue of material fact is in dispute regarding whether his grievance was untimely filed. (DE 205, p. 2.) Banner's objection states "[t]he evidence shows Plaintiff timely (on the same day the incident happened) filed an RTSM that went unanswered and unreturned." (Id.) However, the record shows Banner's testimony on this issue is at best inconsistent and it contradicts his own objection. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") For instance, Banner was asked at his deposition, "[d]id you ever fill out a request to a staff member or a written request to be medically evaluated after arriving in Kirkland on April the 2nd of 2020?" (DE 183-1, p. 66.) Banner responded, "[s]pecifically for those reasons, no. I was still of the mind that those issues would heal on their own." (Id.) On the other hand, "Plaintiff maintains that he did report the incident to Agent Horne of Police Services . . . before [he] even left Lee Correctional." (DE 183, p. 5.) Banner claims he "verbally gave the complaint which was transcribed by Agent Horne. He then read his transcription aloud and when I agreed, I signed the best I could in chains. Agent Horne subsequently made an official report of our interaction where he specially notes in it: 'He would not talk about the assault, only saying it was all on camera.'" (DE 183, p. 5; citing DE 183-1, pp. 97-98.) Notwithstanding, Banner's contradictions, he contends "SCDC staff namely (Jana Hollis) the Deputy Warden at Kirkland Correctional's Maximum

Security Unit prevented [him] from exhausting his administrative remedies when she failed to respond to his RTSM reporting the incident." (Id.)

The Prison Litigation Reform Act ("PLRA") (codified as amended at 42 U.S.C. § 1997e(a) (1996)), mandates, among other things, that prisoners exhaust their administrative remedies prior to filing civil actions concerning prison conditions under Section 1983 or any other federal law. See Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court"). "[T]he PLRA's exhaustion requirement is mandatory," Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 677 (4th Cir. 2005), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," Porter v. Nussle, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion" of available administrative remedies prior to filing suit. Woodford v. Ngo, 548 U.S. 81, 93-94 (2006). As the Supreme Court has noted, "[a]ggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons," whether it be concerns about efficiency or "bad faith." Id. at 89-90. This is especially true in a prison context. Id. at 90 n.1. Nevertheless, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90-91. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). Thus, an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 578 U.S. 632, 643-44 (2016).

Banner points to one instance in the record where he claims he verbally informed Agent Horne of his grievance, (DE 183, p. 5), and that nothing was done after he informed Agent Horne. Banner argues by implication that, since nothing was done, he was prevented from taking advantage of the grievance process. (DE 205, p. 2; citing Moore, 517 F.3d at 725 (". . . an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.").) Although Defendants dispute whether Banner informed Agent Horne of the alleged assault and injuries (DE 168-11, ¶¶ 9, 14), at summary judgment, "[the court] must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Accepting Banner's assertions as true, however, does not help Banner defeat summary judgment. SCDC's Inmate Grievance System does not recognize "verbally informing" a staff member as part of the procedure of submitting a Step 1 grievance. (DE 168-2, ¶ 19.) As noted above, the PLRA requires "proper exhaustion" of available administrative remedies prior to filing suit, and "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford, 548 U.S. at 90-91, 93-94.

Although Banner has identified other documents where he, in fact, filed a written complaint regarding the alleged incident, the documents filed on November 3, 2020, and April 20, 2021, were far beyond the time to comply with SCDC deadlines.[6] Based upon the foregoing, Banner has

---

[6]  On November 3, 2020, Banner submitted an RTSM to General Counsel alleging the same facts as in his complaint in this case. Ms. McKie testified that despite the fact that the request was untimely and

failed to properly exhaust his administrative remedies under the SCDC grievance process regarding the events on April 2, 2020, and therefore, his objection is overruled. Given Banner's failure to exhaust administrative remedies, his Federal law claims must be dismissed. In addition, since this Court no longer has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Banner's State law claims pursuant to 28 U.S.C. § 1367(c)(3). See Archie v. Nagle & Zaller, P.C., 790 F. App'x 502, 506 (4th Cir. 2019) ("[C]ourts have consistently held that a district court has wide latitude in determining whether to retain, remand, or dismiss state law claims pursuant to § 1367(c)).")[7]

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation and incorporates it herein.

It is, therefore, **ORDERED** that Plaintiff's Federal law claims are dismissed for failure to exhaust administrative remedies, and this Court declines to exercise supplemental jurisdiction over Plaintiff's State law claim, and therefore, dismisses this action without prejudice.

---

sent to the incorrect department, because the RTSM alleged employee misconduct, the request was processed and forwarded to Police Services/OII. (DE 168-2, ¶¶ 23-25; DE 168-2, pp. 89, 111.) Similarly, on April 20, 2021, Banner submitted a Step 1 grievance that was initially titled KCI-0221-21, alleging the same facts as in his complaint. This grievance was forwarded to Lee and re-titled Lee CI-0267-21 because the complaint involved Lee staff. (DE 168-2, ¶ 26; DE 168-2, p. 121.) Ms. McKie testified that, despite the untimeliness of the grievance by more than a year, it was still forwarded to Police Services/OII for a formal review and investigation of the alleged assault. (Id. at ¶ 29.)

Nevertheless, based on evidence submitted by Banner, the OII ultimately determined that there was insufficient evidence to pursue any criminal charges or corroborate his allegations, and the investigative case was administratively closed. The Warden denied Banner's Step 1 grievance. (DE 183-1, p. 37, ¶ 33; DE 183-1, p. 78.)

[7]     The Court notes that Banner objects to the Report's recommendation that this Court should not exercise supplemental jurisdiction because Defendants were sued in their official and individual capacities. (DE 205, p. 4.) However, Banner's objection does not address the factors by which this Court addresses whether to exercise supplemental jurisdiction under 28 U.S.C.S. § 1367 (i.e., "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."). Since this Court has dismissed all claims over which it has original jurisdiction, Banner's objection is overruled.

IT IS SO ORDERED.

S/ Joseph Dawson III
Joseph Dawson, III
United States District Judge

Florence, South Carolina
June 23, 2023

**NOTICE OF RIGHT TO APPEAL**

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.